**LAWSON v. BAKER, State Treasurer, et al.**
**(No. 6239.)**

(Court of Civil Appeals of Texas. Austin.
Feb. 25, 1920. Rehearing Denied
March 31, 1920.)

**1. States ⟨⇒⟩193—Taxpayer not specially injured may not sue to enjoin act of state officer.**

A taxpayer and citizen may not maintain suit against public officers, acting under color of authority to restrain their action, without showing special damages to himself, whether they are alleged to be acting merely ultra vires or under unconstitutional law; and so not to prevent the carrying out of the State Depository Law by the state depository board; its provisions being beneficial to him through decreased taxes on account of profits therefrom to the state.

**2. Depositaries ⟨⇒⟩6 — State Depository Law immediately operative.**

The State Depository Law, passed March 31, 1919, in view of the declared emergency from the fact that the depository laws are inadequate to meet "present conditions," there being at the time in the state treasury several million dollars more than could be placed in the then existing depositories will be held intended to become operative at once, and Rev. St. 1911, art. 2418, as amended by the act declaring it the duty of the state treasurer, during the first days of January next after each general election, to mail a circular to all state and national banks in the state, soliciting bids for keeping state funds for a term of two years next after the succeeding March 1, was intended to prescribe a permanent and uniform standard, to be observed after the next general election, and not to require a postponement in the meantime of the selection of depositories for the excess funds, during the interim.

**3. Constitutional law ⟨⇒⟩46(1) — No decision till occasion arises.**

It being the province of the court to decide only questions affecting substantial rights, it will not, in advance of any applicable conditions, determine whether the due process clause of the Fourteenth Amendment would be violated by an exercise of the authority given the state treasurer, by Rev. St. 1911, art. 2426, as amended by State Depository Law of 1919, on failure of a depository to pay over state funds on his check, to forthwith convert the securities deposited by such depository and disburse the money for account of the state funds.

**4. States ⟨⇒⟩125—State Depository Law not violative of Constitution providing that no "money shall be drawn from treasury"; "investment"; "loan."**

Assuming that Const. art. 8, § 6, providing that no "money shall be drawn from the treasury" but in pursuance of specific appropriations made by law, prohibits any loan to or investment with a bank of any state funds, and that money is drawn from the treasury if withdrawn from the official custody and control of the state treasurer, it is not contravened by the State Depository Law, the deposits authorized by the act not constituting a "loan" or "investment," and not taking the funds out of the official custody and control of the treasurer, they being subject to withdrawal at any time, except that 10 days' notice must be given where more than a fifth of the funds in a depository are to be withdrawn; and safety of the funds, as well as profit by way of interest, being one of the chief purposes of the act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Investment; Loan.]

**5. Constitutional law ⟨⇒⟩48—Statute presumed constitutional.**

A statute will be presumed constitutional, and all doubts should be resolved in favor of its constitutionality.

**6. Constitutional law ⟨⇒⟩48—Statutes ⟨⇒⟩188— Statutes interpreted by plain and ordinary meaning in determining constitutionality.**

A statute will not be nullified or saved by refinement of construction, but it and provisions of the Constitution which it is claimed to violate will be interpreted according to the popular meaning of the language employed, except where used in a technical sense; that is, their effect will be determined by the plain and ordinary meaning of the language used.

**7. States ⟨⇒⟩119—Depository Law not violative of provisions of Constitution as to special funds.**

The mere temporary deposit of special funds of the state in depositories, while awaiting investment or disbursement, does not interfere with their application as directed by the various provisions of the Constitution relating thereto, so that the state Depository Law, by authorizing such deposit, does not contravene Const. art. 8, § 6, as to diversion of such funds.

---

⟨⇒⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**8. States ⊙⇒127—State Depository Law provision as to "interest" limited to general funds.**

Provision of the State Depository Law that interest on all funds deposited in depositories shall become part of the general revenue will be construed as limited to general funds, to avoid conflict with Const. art. 8, § 6, as to special funds; for "interest" is an accretion to the principal fund earning it, and, unless lawfully separated therefrom, becomes a part thereof, and interest earned by deposit of special funds is an increment accruing to such special fund.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interest.]

**9. Constitutional law ⊙⇒48 — Statute to be construed as not in conflict with Constitution.**

If a statute may be so construed as to avoid conflict with the Constitution, this will be done.

**10. Statutes ⊙⇒64(1)—Portion of law sustained where separable.**

If a part only of a statute be void, the remainder will be sustained, if it is separable, so that it may safely be presumed that it would have been passed without the void part.

Appeal from District Court, Travis County; Ireland Graves, Judge.

Suit by H. S. Lawson against John W. Baker, State Treasurer, and others. From judgment denying temporary injunction, plaintiff appeals. Affirmed.

McGregor, Burr & Lewis, of Houston, for appellant.

C. M. Cureton, Atty. Gen., and Jno. Maxwell and C. W. Taylor, Asst. Attys. Gen., for appellees.

BRADY, J. Appellant brought this suit to test the constitutionality of chapter 145, Acts of the regular session of the Thirty-Sixth Legislature, and known as the "State Depository Law." The action seeks to restrain the State Treasurer, the Attorney General, and the Commissioner of Insurance and Banking, in their respective official capacities, and as members of the Depository Board, from enforcing and carrying out the provisions of such act.

It is claimed that the act is repugnant to the Fourteenth Amendment to the Constitution of the United States, and of the following provisions of the state Constitution: Section 6 of article 8, section 7 of article 8, section 51 of article 3, section 4 of article 7, section 5 of article 7, section 9 of article 7, and section 11 of article 7.

The pertinent part of section 6, article 8, reads as follows:

"No money shall be drawn from the treasury, but in pursuance of specific appropriations made by law."

Section 7 of the same article provides:

"The Legislature shall not have power to borrow, or in any manner divert from its purpose, any special fund that may or ought to come into the treasury; and shall make it penal for any person or persons to borrow, withhold or in any manner to divert from its purpose, any special fund, or any part thereof."

The other constitutional provisions invoked in the verified petition, relate to various special funds, created or defined in the Constitution, and the substance only of same will be stated.

Section 51, article 3, prohibits the Legislature from making any grant, or authorizing the making of any grant of public money to any individual, association of individuals, municipal or other corporation, whatsoever; and by an amendment, adopted November 5, 1912, authorized the Legislature to levy and collect a specific tax, for the purpose of creating a special fund for the payment of pensions to Confederate veterans and their widows.

Section 4, article 7, provides for the investment by the comptroller, under the direction of the board of education, of the proceeds of lands thertofore set apart to the public free school fund. The investment is required to be in bonds of the United States, the state of Texas, or counties of the state, or in similar securities, and under such restrictions as may be prescribed by law, and the state is made responsible for all investments.

Section 5 of the same article provides that the principal of bonds and other funds, and the principal arising from the sale of lands set apart to the school fund shall be the permanent school fund; and the interest derivable therefrom and from taxes levied shall be the available fund. It is specifically provided that no law shall ever be enacted, appropriating any part of the permanent or available school fund to any other purpose whatsoever.

Section 9, article 7, provides and sets apart certain lands and donations as the permanent fund for the support and maintenance of the state asylums. The Legislature is limited, in its power of investment of proceeds of these lands, to the same manner as provided for the investment of school lands in section 4.

Section 11 provides for the permanent university fund, and specifically prescribes that the funds as realized and received into the treasury shall be invested in bonds of the state of Texas, if obtainable, and, if not, in United States bonds, and the interest accruing thereon shall be subject to legislative appropriation for the maintenance and support of the university.

As to each of the special funds mentioned, it is claimed in the petition that the act in question authorized and directed the diversion of such funds from their constitutional purpose, by the depositing of such funds in banks selected as state depositories; and it

is especially insisted that the interest earned upon such funds becomes in law a part of the funds, and may not be lawfully diverted by the Legislature to any other fund, or to any other than the constitutionally declared purpose. The act provides that the interest on all funds accruing from the deposit in banks shall become a part of the general revenue.

The statement of the grounds and facts upon which appellant, in his capacity as a citizen and taxpayer, relies to sustain his right to maintain this suit will be reserved for a discussion of that question in the opinion.

The respondents answered by general demurrer and special exception to a portion of the petition, and also by general denial. The trial court rendered judgment, denying the application for temporary injunction, from which order this appeal was taken. It is recited in the judgment that the hearing was had upon the pleadings and argument of counsel, and it appears that no evidence was introduced.

In order to a better understanding of the questions involved upon this appeal, the substance of the pertinent provisions of the statute will be stated.

The act constitutes the three state officers named as the depository board, and makes the state treasurer the secretary. The depositories are selected through bids, and the banks are required to stipulate in their bids that the books and accounts of each institution, designated as a state depository, shall be open at all times to the inspection of the board, or any member thereof. No bids providing for less than 3 per cent. interest on average daily balance of state funds may be considered. To secure the deposits, in addition to the security afforded by the banking laws, state and federal, a bank qualifying as a depository is required to deposit with the state treasurer, in an amount one-fifth greater than the amount of state funds the bank proposes to keep, United States or other bonds, or other commercial securities, or shall execute a surety bond in amount not less than double the funds deposited in such bank, but a surety bond may be rejected by the board in its discretion.

Article 2425, in part, provides that—

"After the depositories have qualified as provided in the preceding articles, it shall be the duty of the state treasurer to deposit the funds belonging to the state in such depositories."

It is also therein provided that the funds shall be so kept in the banks as that the state shall receive the highest rate of interest possible, and that no depository shall be entitled to keep on deposit an amount more than its paid-up capital stock and permanent surplus. There is a proviso that the treasurer may retain in the state treasury from time to time, with the express consent of the board, sufficient funds to meet the current demands on the treasury.

Provision is made for the custody of the securities deposited with the state treasurer, and the treasurer is given power, in case a depository fails to pay deposits, or any part thereof, on his check, to forthwith convert the bonds into money, and to disburse the same, upon warrants drawn by the comptroller, upon the funds for which the bonds are secured.

By article 2427 banks are required to pay the interest monthly, "which interest shall become part of the general revenue." The board has power to designate certain depositories as receiving depositories.

Article 2431 provides that:

"All state funds shall be deposited and kept in state depositories designated under this chapter, subject to the regulations of this chapter; provided that the state treasurer may with the consent of the Depository Board retain in the state treasury at Austin sufficient funds to meet the current expenses of the government in case he finds it advisable to do so."

All state depositories are required to collect, without cost to the state, all checks, drafts, and demands for money, and are required to issue to the state treasurer a draft or exchange for any sum on deposit by the state, not exceeding the amount of the state's deposit in such depository; but it is provided that the treasurer shall give the depository 10 days' notice of his intention to withdraw the funds before drawing more than one-fifth of the amount the depository is entitled to keep. This limitation, however, does not apply to deposits made during the preceding 30 days.

The board is authorized to make rules and regulations governing the establishment, conduct, and handling of funds by state depositories as the public interest may require, not inconsistent with the provisions of the act.

The act also provides for the selection of additional depositories for the purpose of clearing the state's business. It repeals all laws or parts of laws in conflict, and contains an emergency clause.

## Opinion.

The case has been admirably briefed and argued, and we acknowledge our obligation to counsel for the abundant citation of authority, which has aided us materially in determining the important and difficult questions at issue. We shall not be able, within the compass of an opinion of reasonable length, to review any great number of these authorities, but they have all been read and considered.

[1] The first question for our consideration is the claim of the respondents that appellant is not authorized, as a taxpayer or citizen, to maintain this action. The con-

tention specifically is that appellant has not shown any injury to himself, either existing or threatened, which gives him any standing in a court of equity to restrain respondents from proceeding under and acting in virtue of the act, the constitutionality of which has been drawn in question.

In behalf of appellant, it is asserted that he has shown himself entitled to institute and prosecute this suit, because he alleged that he was a property owner and taxpaying citizen of the state of Texas, and a resident of Travis county, and has been a property owner in the state for many years, including the years 1918 and 1919, for which years he has paid taxes, and his property will be subject to taxation, and that he will continue to pay state and county taxes, for the purposes fixed by the Constitution and statutes. That these taxes, mingled with those of many thousands of other citizens and taxpayers, have been received and will come into the treasury of the state, and that by virtue thereof he is entitled to restrain the alleged unlawful deposit and diversion of state funds.

He relies upon the following authorities: Kaufman County v. McGaughey, 3 Tex. Civ. App. 655, 21 S. W. 265; Terrell v. Middleton, 187 S. W. 367; City of Austin v. McCall, 95 Tex. 565, 68 S. W. 791; Carman v. Woodruff, 10 Or. 133; Bank of Eastern Arkansas v. Bank of Forrest City, 126 S. W. 837; Chamberlain v. Tampa, 40 Fla. 74, 23 South. 572; Crampton v. Zabriskie, 101 U. S. 609, 25 L. Ed. 1070.

As against appellant's right, and as sustaining the proposition that, in order for a taxpayer to maintain a suit in equity to enjoin state officers in the enforcement of a void law, he must allege and prove irreparable injury peculiar to himself, for which there is no adequate remedy at law, respondents cite the following authorities: 4 Dillon (5th Ed.) §§ 1570 to 1586; High on Injunction (4th Ed.) § 1308 et seq.; Pomeroy on Equity Jurisprudence, vol. 5, § 326; Simkins on Equity, pp. 793, 794; Caruthers v. Harnett, 67 Tex. 127, 2 S. W. 523; Harrell v. Lynch, 65 Tex. 146; Oden v. Barbee, 103 Tex. 449, 129 S. W. 602; Sweeney v. Webb et al., 33 Tex. Civ. App. 324, 76 S. W. 768; Atkins v. State Highway Dept., 201 S. W. 226; Bayle v. New Orleans, 23 Fed. 843; Nalle v. Austin, 21 S. W. 375; Altgelt v. San Antonio, 81 Tex. 436, 17 S. W. 75, 13 L. R. A. (N. S.) 383; Polly v. Hopkins, 74 Tex. 145, 11 S. W. 1084; Pierce v. Hagans, 79 Ohio St. 9, 86 N. E. 519, 36 L. R. A. (N. S.) 1, and notes thereunder, especially on page 26, 15 Ann. Cas. 1170; San Antonio v. Sturmberg, 70 Tex. 366, 7 S. W. 754.

In the case of Kaufman County v. McGaughey, supra, Justice Key, speaking for this court, quotes language from High on Injunction which would seem to give color to appellant's claim. It is to be observed, however, that the statement quoted from this author does recognize that in order to authorize the citizen to maintain a suit to enjoin the acts of public officers they must be such as will result in serious injury to the citizen, without any corresponding benefit to the public; and that equity will interfere only when the officers seek to infringe upon or violate the rights of the citizen, under pretense of assumed but unlawful authority, and that the interference of equity is for the protection of the citizen. Justice Key specially calls attention to the considerations, which in that case disclosed that Kaufman county had a special and peculiar interest in the subject-matter of the litigation. The action was to restrain an attempted or threatened change in the boundary line between Hunt and Kaufman counties. It was made to appear in that case that Kaufman county, unless the action of the officer was restrained, would not only be harassed and involved in a multiplicity of legal proceedings, but probably defeated in the collection of some of its legitimate revenues. It is clear that the county showed an interest peculiar to itself, and was a proper plaintiff.

In Terrell v. Middleton, supra, the suit was to restrain the comptroller from issuing warrants on the state treasurer, covering certain expenditures by the Governor, which is was claimed were in excess of his salary and compensation fixed by the Constitution. It is clear, from the issues of that case that Middleton, a taxpayer and citizen, was seeking to restrain an alleged illegal expenditure of public funds, and the payment from the state treasury of revenues derived from taxation. The Court of Civil Appeals for the Fourth District sustained his right to maintain the suit, and it must be confessed used language broad enough to support appellant's contention in this case, citing Crampton v. Zabriskie, supra, and City of Austin v. McCall, supra. The thing sought to be restrained, however, was a threatened loss to the taxpayers of the state, and the disbursement of the funds of the state.

In the instant case, the averments of the petition, taken in connection with the provisions of the statute in question, show that instead of a loss and injury to either public or private rights, the funds of the state would be increased by the operation of the law. Upon the deposit of the state funds, there arises the reciprocal obligation of the depository to return, not the particular money deposited, but its equivalent and in kind, together with the interest which has accrued upon the funds under the contract. Except upon remote contingency, considering the safeguards thrown around the funds on deposit by the banking laws and by the security exacted in the act, there was no threatened loss or injury to restrain; therefore this case is wanting in the peculiar interest of the

taxpayer that was present in the Middleton Case.

In City of Austin v. McCall, a taxpayer brought a suit to enjoin the municipal corporation from making an illegal contract, which it was held would have the effect of creating a debt, and subjecting the property of the taxpayer to the payment of taxes to apply upon such debt. Justice Brown also quoted from Crampton v. Zabriskie, supra. The last-mentioned case is reported in 101 U. S. 609, 25 L. Ed. 1070, and the language quoted with approval by our courts from the opinion of Justice Field is as follows:

. "Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt which they in common with other property holders of the county may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the state courts in numerous cases; and from the nature of the powers exercised by municipal corporations, the great danger of their abuse, and the necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere upon the application of the taxpayers of a county to prevent the consummation of a wrong, when the officers of those corporations assume, in excess of their powers, to create burdens upon property holders. Certainly, in the absence of legislation restricting the right to interfere in such cases to public officers of the state or county, there would seem to be no substantial reason why a bill by or on behalf of individual taxpayers should not be entertained to prevent the misuse of corporate powers. The courts may be safely trusted to prevent the abuse of their process in such cases."

It will be noted that the quotation recognizes no more than that a resident taxpayer may proceed in equity to prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt which they may be compelled to pay. Interposition of equity is justified only in cases where officers assume, in excess of their lawful powers, to create burdens upon the property holders, and not merely to prevent the unlawful exercise of powers when they do not affect injuriously the citizen or taxpayer. What was said by Justice Field must be taken in connection with the facts of the case. The suit was for the cancellation of certain bonds, which were claimed to have been illegally issued, and which evidenced a debt the taxpayer would have been required at least in part to pay. The attempt to enforce payment of the bonds involved in that case necessarily operated to place a burden upon the taxpayer.

We will now consider some of the authorities invoked by the respondents as against the right of appellant to maintain the suit.

In High on Injunctions (4th Ed.) § 1408, it is said:

"The preventive jurisdiction of equity extends to the acts of public officers, and will be exercised in behalf of private citizens who sustain such injury at the hands of those claiming to act for the public as is not susceptible of reparation in the ordinary course of proceedings at law."

And further that:

"When a plain official duty requiring the exercise of no discretion is incumbent and obligatory upon a state officer, he may be enjoined from acting in violation of such duty by one who will thereby sustain a personal injury for which adequate compensation cannot be had at law."

It thus seems that Mr. High recognizes that before a taxpayer has a remedy in equity he must have suffered or be threatened with special injury without adequate remedy at law.

Simkins on Equity, page 793, discussing this question, seems to announce the rule to the same effect, and states that there must be some injury to property rights.

Pomeroy, in Equity Jurisprudence, vol. 5, § 326, said:

"Hence, it would seem that an injunction should not issue against a state officer, unless some special and direct injury to the plaintiff is shown."

Mr. Dillon, in Municipal Corporations (5th Ed.) vol. 4, §§ 1570 to 1586, inclusive, discusses this question, and says:

"There can ordinarily be no judicial restraint or interference with the bona fide exercise of powers legislative or discretionary in their nature, and which do not violate private rights."

In section 1587 of the same volume, this author states the conclusion that a taxpayer or citizen may resort to equity to restrain illegal and ultra vires acts by officers of municipal corporations, where such acts affect injuriously the property owner or the taxable inhabitant, and that such taxpayer may enjoin such acts where the effect will be to impose upon him an unlawful tax, or to increase his burden of taxation.

Thus the text-writers seem to recognize the doctrine that there must be some violation of a property right, or the imposition of some burden peculiar to the taxpayer, before he would be authorized to prosecute such a suit.

In Barber County v. Smith, 48 Kan. 331, 29 Pac. 565, this statement was made:

"This court has always held that before a private citizen can be allowed to maintain an action of this character he must allege and show some interest, personal and peculiar to himself, that is not shared by or does not affect the general public; and it is not enough that his damages are greater than those sustained by the general public, thus differing only in degree, but they must be different in kind."

In Polly v. Hopkins, supra, Justice Stayton, speaking for our Supreme Court, said:

"The right to such relief [injunction] depends on the fact that without it a burden which he must bear will be placed on him by an illegal act. The taxpayer is not the guardian of the good name of the county, as appellees seem to suppose themselves to be."

The right of the taxpayer to bring the suit was recognized in that case, but the action was to enjoin the execution of a certain contract, and the execution of bonds which were alleged to be illegal and void. It appears that the case involved a threatened burden upon the property of the taxpayer.

The same eminent judge, in Caruthers v. Harnett, supra, said:

"The general rule where an injunction is sought to restrain the acts of the public officers is thus clearly stated: 'He who seeks to restrain improper or unlawful conduct on the part of public officers must allege sufficient facts to show that he has such an interest in the public welfare as to make him a proper party to prevent the commission of a public wrong. It will generally suffice that the persons seeking the injunction are residents and taxpayers. * * * But to warrant the relief in behalf of citizens and taxpayers against acts of public officers, it should be shown that plaintiff's rights will be greatly and irreparably injured by the acts which it is sought to enjoin; and, unless this is shown, the relief will be denied.' High on Injunctions, 1321."

In Altgelt v. City of San Antonio, supra, the plaintiff, a taxpayer and resident of the city, sought an injunction to prevent the execution by the city authorities of a certain contract with a water company, because a monopoly and against public policy. It was stated in the opinion, in substance, that the mere illegality of the contract and its creation of a monopoly would not alone suffice to entitle Altgelt to bring suit to vacate or set it aside. It was expressly stated that—

"The plaintiff does not show by his averments that he, as a taxpayer of the city, is authorized to maintain this action by reason of any injury resulting to him from the contract of October, 1877, entered into by the city of San Antonio."

In the City of San Antonio v. Sturmberg, supra, Justice Gaines said:

"We think it a principle established by the overwhelming weight of authority in the courts of all countries subject to the common law that no action lies to restrain an interference with a mere public right, at the suit of an individual who has not suffered or is not threatened with some damage peculiar to himself. * * * For a special damage resulting from the invasion of a right enjoyed by a party in common with the public, the law affords him a remedy by private action, but if the damages he suffers are only such as are common to all, the action must be brought by the lawfully constituted guardian or guardians of the public interest."

In Harrell v. Lynch, supra, the plaintiff sought an injunction to prevent the alleged illegal removal of a county seat. In denying the injunction, the court said:

"As no man has a property right in the location of the county seat, its unlawful removal * * * gives him no cause of action. Being deprived of no right, the depreciation of the value of his property is not a wrong for which a court of equity, in the absence of a legal remedy, would invent the means of redress."

From these decisions of our own courts, it seems also to be the recognized rule in this state that, before a complainant may maintain a suit in equity against public officers, acting under color of authority, to restrain their action, he must show damages special to himself and different from those suffered by the public at large. This seems to be true whether such public officers are acting merely ultra vires or under void and unconstitutional laws.

The plaintiff's case here, instead of showing some injury peculiar to himself in the operation of the law sought to be nullified, shows a benefit. There is neither an actual nor threatened loss to the state or himself alleged as a result of which any burden would be placed upon him, but his petition shows that a profit to the state would result, which would benefit plaintiff in decreased taxes, rather than burden him with increased taxation. It is not alleged that under the act the state funds will be expended, or in any just sense misappropriated, but merely that there will be a diversion from legal and constitutional purposes. From these considerations, and in the light of the authorities, we have reached the conclusion that the appellant has not the right to prosecute this suit, and that upon this ground alone the judgment of the trial court could be affirmed.

The writer feels it proper to say that he has come to the conclusion just announced with great difficulty, and is not free from doubt upon the point, although not prepared to dissent from the views of his Associates. The strong current of authority in this state, as well as elsewhere, sustaining the view announced, impels me to yield acquiescence to the decision. However, if it were an open question, I would consider that, when a taxpayer and citizen seeks to enjoin the alleged misuse of power by public officers, through a void and unconstitutional law, equity should grant him relief in some circumstances, even though he does not show an injury special to himself, or the invasion of some property right. I know of no constitutional provision or statute which specifically makes it the duty of any officer or person to bring such a suit. In other words, there does not appear to be in Texas any general guardian of the public interest. If it may be assumed that the Attorney General, by virtue of his great office as chief law officer of the state, may and should in proper case assume that duty, it might be well re-

plied in the instant case that the Attorney General himself is made a member of the State Depository Board, and is not free to bring the action. Furthermore, the Attorney General has, as to its main features, approved the constitutionality of the statute, and under his advice the board and he, as a member thereof, are acting under, or attempting to enforce, the provisions of the law. Of course, being convinced of its constitutionality, it would seem plainly to be his duty so to do. But in whom, in such a situation, is the remedy to restrain these officers from enforcing a void act, assuming its unconstitutionality, as must be done for the purposes of deciding this question?

These views sufficiently indicate the trend of my thought on the subject, but I am restrained by what is conceived to be the rule of decision as announced by the Supreme Court of this state, and in deference thereto I concur in the conclusion that plaintiff has no right to maintain the action.

The denial of plaintiff's right to prosecute the suit would alone be determinative of this appeal; but, in view of the conclusion we have reached upon the other questions in the case, we have decided not to rest the decision upon that ground only. The remaining questions will not be discussed in the order of their presentation in the briefs, but we will endeavor to cover all contentions.

[2] It is claimed by appellant that he is entitled to injunctive relief because the Depository Act does not become operative until January 1, 1921, and that no deposit of state funds could be legally made thereunder until March 1, 1921. This point is based upon the language of article 2418, as follows:

"It shall be the duty of the state treasurer, *between the first and fifth day of January next after each general election*, to mail to each state and national bank doing business in this state a circular letter soliciting bids for keeping state funds, for a term of two years next after the succeeding March 1, upon the condition prescribed in this chapter."

Emphasis is also laid upon the fact that the next two articles provide that the bids shall be mailed to the state treasurer in time to reach his office on or before noon of the *succeeding first Monday in February*, and that he shall *on the first Monday in February* open the same. It is also suggested that, while in article 2421 authority is given the board to solicit bids from banks for the privilege of acting as state depositories at other dates, in case the banks being used as state depositories are not sufficient to handle all the funds of the state, this power is limited to the case of state depositories selected "as provided in this chapter."

The act contains an emergency clause, received the necessary vote to suspend the constitutional rule, was approved by the Governor March 31, 1919, and filed with the secretary of state the following day. Therefore it is undisputed that the act purported to become a law on April 1, 1919. It contains a repealing clause, repealing all laws or parts of laws in conflict. The question, therefore, is whether the operation of the act was postponed to January 1, 1921, or whether it became immediately operative upon its being filed with the secretary of state.

The last general election prior to the passage of this act was in November, 1918, and the next general election thereafter is in November, 1920. If the question is to be determined by the literal provisions of articles 2418 to 2420, inclusive, it is clear that the law is not to be administered until January 1, 1921. We have reached the conclusion, but not without difficulty it must be confessed, that the law became operative and effective immediately upon its passage, and we will give our reasons for the conclusion.

It is a paramount rule of statutory construction that in case of doubt the intention of the Legislature is to be ascertained, if possible. To this end the courts are not confined to the mere letter of the statute, and especially to particular or isolated provisions, but must seek diligently to determine the legislative intention, and, as it is sometimes expressed, from the four corners of the act. At the time this statute was passed, a system of state depositories had been instituted, and the statutory provisions governing the same were found in chapter 1, title 44, Revised Statutes. Under those enactments, state depositories had been selected and were keeping the state funds. Article 2423 limited the funds which any one depository might receive from the state to a sum not exceeding $50,000. Under the then existing laws, as shown by the public records, 18 depositories had been selected, carrying not exceeding $900,000 of state funds. It is a matter of common knowledge that at the time of the passage of this statute, there was on hand in the state treasury several million dollars over and above the amount that could be received by the depositories then in existence. It was the prime purpose for the enactment of this act to provide additional depositories for the safe-keeping of this excess, and to secure to the state interest upon funds that would otherwise remain idle in the treasury.

The emergency clause of a statute is often an important aid in determining the legislative purpose, and in this case we think it is peculiarly so. The emergency, requiring the suspension of the constitutional rule as. to this statute, is stated in section 3 as follows:

"The fact that the depository laws of the state of Texas are inadequate to meet present condition creates an emergency."

We think it manifest that the act was passed, not to meet future conditions, or conditions arising nearly two years after-

wards, but to meet conditions as they then existed. The "present conditions" referred to were evidently those which we have just stated, and which were matters of common knowledge. The construction seems to us inconceivable that the Legislature purposely postponed the operation of the act for a period of about two years, thus depriving the state of a large amount of interest, when the very occasion for the legislation was the placing in depositories of idle funds then on hand in the treasury. It appears much more reasonable to hold that the Legislature intended that the act should have immediate effect, and that the provision in article 2418 as to the time of sending our circular letters soliciting bids was intended to prescribe a permanent and uniform standard, to be observed each biennium after the next general election, which was the first to which the standard could be made applicable, and after each succeeding general election, but that in the meantime the selection of depositories for the excess funds should not be postponed. It is especially significant that the Legislature did not provide between the first and fifth days of January "after the next general election," but used the phrase, "next after each general election," thus fixing a permanent standard for the operation of the law, when the standard might become applicable. If it had been intended to postpone the effect of the law until after the next general election, it would have been more appropriate to have used the language we have suggested, or words of similar import.

The construction we have placed upon the act is strengthened by the fact that nowhere in the statute is there evidence, either expressly or impliedly, of an intention to abrogate existing contracts with state depositories under the old law. Indeed, it may be seriously doubted whether it was within the constitutional power of the Legislature to have abrogated such contracts; therefore it would appear that the Legislature intended that the existing depositories should retain the state funds in their hands, under their contracts, and that the excess of funds might be distributed to other depositories to be immediately selected, it not being possible to comply with the provision for soliciting bids between the 1st and 5th days of January after the next general election, without postponing the operation of the act for virtually two years.

There is much force, too, in the construction suggested by the Attorney General that the authority given in article 2421 to solicit bids at other dates applies, and that the board was authorized to immediately advertise for bids thereunder. The first clause in that article, "in case at any time banks being used as state depositories" might be construed as meaning the depositories which were then keeping state funds, under the authority of the old laws. This contention, however, is weakened by the consideration that the clause is itself limited by the language, "as provided in this chapter," and the chapter as amended does not expressly refer to the existing depositories. We prefer to rest our decision, on this point, upon the construction that, in the light of the entire act, it was the intention of the Legislature to authorize the board to immediately select depositories, sufficient to take care of all the state funds, in the interim between the passage of the act and the next general election, after which time the provisions of articles 2418, 2419, and 2420 as to time would be applicable. This view harmonizes the legislation with the existing conditions sought to be remedied, and squares the act with the prime purposes of the Legislature.

[3] It is also claimed by appellant that the act violates the due process clause of the Fourteenth Amendment to the federal Constitution, especially in that under article 2426 the state treasurer, where a depository fails to pay over the state funds upon his check, is authorized to forthwith convert the securities deposited by such depository into money, and to disburse the same for account of the state funds. It is thought to be sufficient reply to this contention that appellant has not shown any interest in the securities deposited under this act, or that may be deposited thereunder. It is not even charged that any securities of any bank will be so converted. The exercise of the power of the treasurer is itself dependent upon a contingency which may or may never arise. Until it does it would seem that a decision upon the question would be the determination of an abstract question rather than one affecting substantial rights, which alone the courts were instituted to decide. For these reasons, we overrule the contention that appellant is entitled to injunctive relief because of the supposed violation of the federal Constitution.

It may also be seriously questioned whether even a depository, seeking to prevent the exercise of power of converting security by the state treasurer, could successfully invoke the due process clause of the Fourteenth Amendment to the Constitution of the United States. The state has the right to deny any bank or person the privilege of acting as a state depository. This right is absolute, and where the state confers the privilege, it would seem to follow that it may make it dependent upon such conditions as it sees fit to prescribe, provided, of course, it does not take away some constitutional guaranty. A bank, contracting with the state under this law, voluntarily assumes the benefits and burdens of the law. Having voluntarily consented to such a disposition of its securities on deposit with the state treasurer, it might well be held that a bank could not complain of the conversion of its securities into money, and application to its indebtedness to the state without legal process, as a denial of

due process of law. Fidelity & Deposit Co. of Md. v. Wilkinson County, 109 Miss. 879, 69 South. 868; Ins. Co. v. Mettler, 185 U. S. 308, 22 Sup. Ct. 662, 46 L. Ed. 922.

[4-6] We now proceed to the consideration of the constitutional objections based upon provisions of our state Constitution. It is claimed that the deposit of state funds in depositories infringes section 6, article 8, as to all the state funds, without distinction between general revenue and special funds created by the Constitution. The basis of this claim is that the Constitution prohibits the drawing of any money from the treasury, except in pursuance to specific appropriation made by law, and that the deposit of state funds with a bank constitutes a loan and an investment. This is said to be a diversion of all the funds, and, as to the special funds, is an investment and diversion contrary to the constitutional directions as to the loan and investment of the several special funds. The discussion of these questions will not embrace the question of diversion of interest from the special funds, which will be put to one side for the present.

In considering these questions, we wish to state certain recognized fundamental principles binding upon all courts. At this day, it is but a trite statement to say that an act of the Legislature will be presumed to be constitutional, and that all doubts should be resolved in favor of its constitutionality. But when it is remembered that the Legislature is a co-ordinate branch of the government of equal dignity with the judicial department, this is a principle which cannot be too often recalled and applied. A strong statement based upon this principle, and worthy of repetition, is that of Mr. Justice Brown, speaking for our Supreme Court, in the case of Harris County v. Stewart, 91 Tex. 133, 41 S. W. 650:

"Courts have no right to declare an act of the Legislature void because it is against the spirit of the Constitution; when a judge pronounces a law to be contrary to the Constitution, he must be able to put his finger upon the provision of that instrument which prohibits the act, or from which the prohibition necessarily arises."

It is also a familiar rule—more honored in the breach than the observance, however—that statutes will not be nullified by subtlety and refinement of argument or construction. Neither will they be saved by such process. They and the constitutional provisions which it is claimed they violate will be interpreted according to the popular meaning of the language employed, except where used in a technical sense. In other words, their effect will be determined by the plain and ordinary meaning of the language used.

Keeping in mind the rules just stated, let us examine the contentions of appellant upon this point. Whatever may be the precise meaning of the prohibition in the Constitution that no money shall be drawn from the treasury but in pursuance of specific appropriations made by law, it would seem not to admit of serious argument that it will be effective to prohibit the Legislature, or any officer under its direction, from lending or investing state funds, except as authorized in the Constitution. As to all the public funds of the state, if the Legislature has the power to lend the state's money to banks, it would seem clearly to have the power to lend same to the individual citizen of the state, or to other corporations. This is inconceivable, and we shall assume that the constitutional provision referred to prohibits any loan to or investment with any bank, of the state funds without distinction as to the general and special funds. We shall also assume that under this and the other constitutional provisions invoked, money shall be considered as drawn from the treasury if it is in fact withdrawn from the official custody and control of the state treasurer. He is a constitutional officer, and, by the very nature of his office, is the official custodian of the public funds.

Appellant has cited many authorities to the effect that the general deposit of money in banks, with or without a stipulation for interest, is a loan, and in some of them an investment; notably the following: West Chicago Park Com'rs v. McNulta, 99 Fed. 900, 40 C. C. A. 155; In re Salmon et al. (Dist. Ct. W. D. Mo.) 145 Fed. 649; Fidelity & Deposit Co. of Maryland v. Wilkinson Co., 109 Miss. 879, 69 South. 865; Watson v. El Paso County, 202 S. W. 126; Anderson v. Walker, 49 S. W. 937; In re State Treasurer's Settlement, 51 Neb. 116, 70 N. W. 532, 36 L. R. A. 746; Natl. Bank of Crete v. Bartley State Treasurer, 39 Neb. 353, 58 N. W. 172, 23 L. R. A. 67; (A. L. R. Service Bureau Report shows that this case has been cited in the following decisions: Nichols v. State, 46 Neb. 719, 65 N. W. 774; State Treasurer's Settlement, 51 Neb. 131, 134, 70 N. W. 532, 36 L. R. A. 751; Bartley v. State, 53 Neb. 337, 73 N. W. 744; Johnson County v. Chamberlain Banking House, 74 Neb. 550, 104 N. W. 1061; State v. Fink, 74 Neb. 644, 104 N. W. 1059; Citizens' State Bank v. Worden, 95 Neb. 55, 144 N. W. 1064; State v. Ross, 55 Or. 462, 104 Pac. 596, 106 Pac. 1022, 42 L. R. A. [N. S.] 601; United States Fidelity & Guaranty Co. v. American Bonding Co., 31 Okl. 669, 122 Pac. 142; Yellowstone County v. First Trust & Savings Bank, 46 Mont. 449, 128 Pac. 596; Rice v. Halsey, 156 App. Div. 806, 142 N. Y. Supp. 58; State v. Marron, 18 N. M. 435, 137 Pac. 845, 50 L. R. A. [N. S.] 279; Phillips v. Bank, 98 Kan. 387, 158 Pac. 23, L. R. A. 1917A, 682); Case note 50 L. R. A. (N. S.) 274; State v. Marron, 18 N. M. 426, 137 Pac. 845, 50 L. R. A. (N. S.) 274; Lion Bonding & Surety Co. v. Austin, 208 S. W. 542.

We shall not undertake to review these

authorities but they generally announce the conclusion that in such case a loan is effected because the relation of debtor and creditor arises between the bank and the depositor.

In re State Treasurer's Settlement, 51 Neb. 116, 70 N. W. 532, 36 L. R. A. 746, a case arising under the Nebraska State Depository Law, the court held:

"A deposit of state funds, under the provisions of the law, amounts to a loan or investment of the funds so deposited."

And a similar holding was made in State ex rel. First Natl. Bank of Crete v. Bartley, State Treasurer, 39 Neb. 353, 58 N. W. 172, 23 L. R. A. 67. The holdings in these cases may be summed up in the proposition that a loan or investment results from the deposit of money in bank, because the title to the money passes to the bank, and the depositor thereby becomes a creditor, and is not entitled to the return of the identical money deposited, except in the case of a special deposit.

To the contrary, appellees contend that the placing of state funds in depositories, as is provided and contemplated by our statute, does not constitute either a loan, investment, or diversion of such funds, citing the following cases: People v. McKinney, 10 Mich. 54; Moulton v. McLean, 5 Colo. App. 454, 39 Pac. 78; Allibone v. Ames, 9 S. D. 74, 68 N. W. 165, 33 L. R. A. 585; State v. McFetridge, 84 Wis. 473, 54 N. W. 1, 20 L. R. A. 223; Warren v. Nix, 97 Ark. 374, 135 S. W. 896; State v. Hill, 47 Neb. 456, 66 N. W. 541; Bardsley v. Sternberg, 18 Wash. 612, 52 Pac. 251, 524; Hunt v. Hopley, 120 Iowa, 695, 95 N. W. 205; Davis v. Dunlevy, 11 Colo. App. 344, 53 Pac. 250; State v. Rubey, 77 Mo. 610; Baker v. Williams, etc., 42 Or. 213, 70 Pac. 714; Thompson v. Territory, 10 Okl. 409, 62 Pac. 355; Farmers', etc., v. City, 62 Neb. 442, 87 N. W. 175; Elliott v. Capital City State Bank, 128 Iowa, 275, 103 N. W. 777, 1 L. R. A. (N. S.) 1130, 111 Am. St. Rep. 198; Charlton v. Cousins, 103 Tex. 116, 124 S. W. 422; Horton v. Rockwall Co., 149 S. W. 299; Estate of Law, 144 Pa. 499, 22 Atl. 831, 14 L. R. A. 103; Nebraska v. Bank (C. C.) 88 Fed. 947; Re Curtis, 26 R. I. 580, 60 Atl. 240.

The majority, if not all these adjudications, hold that the general depositing of money in a bank or depository, with or without interest, subject to the check or demand of the depositor, is not a loan or investment. The basis of distinction recognized in these cases is that a loan is for the benefit of the borrower, and cannot be withdrawn until the same becomes due, at the time fixed in the contract, which is usually some time certain. On the other hand, a deposit is for the benefit of the depositor primarily, and, while it is true that the relation of debtor and creditor results, it is not necessarily a loan. If the money is to remain on deposit for a fixed period, during which time the depositor

has no right to demand the return of the money, the transaction may be regarded as in all substantial respects a loan, but if the deposit is not for a time certain, but the money must be returned upon demand of the depositor, the transaction cannot, in any proper sense, be regarded as a loan.

We quote from three of these cases, to illustrate the reasoning upon which this conclusion was reached:

In the case of Allibone v. Ames, a decision by the Supreme Court of South Dakota, the question for determination was the legal effect of an act of the county treasurer in placing county funds on deposit in a bank. In this case it was contended that the deposit constituted a loan. It was unlawful in South Dakota for a county treasurer to lend the money belonging to his county, with or without interest. Upon the merits, the court discussed the question as to whether or not such a deposit was a loan, and said:

"Assuming that, if the contract between plaintiff and the bank is unlawful, its sureties are not liable, we proceed to consider whether the transaction was, in fact or effect, a loan, within the true intent and meaning of any constitutional or statutory inhibition. Plaintiff acted within the terms of the undertaking. He did precisely what was contemplated by the contract and all concerned. He did only what state, county, city, town, and school treasurers are doing every day, and have done since banks began to exist in the territory. The transaction was one peculiar to banking business—a general deposit, in which the return of the identical coin or currency was not intended. For some purposes such deposits are spoken of as equivalent to loans, because, like loans, they create the relation of debtor and creditor. Marine Bank v. Fultan Bank, 2 Wall. 252 [17 L. Ed. 785]; McLaughlin v. Bank, 6 Dak. 406, 43 N. W. 715; Comp. Laws, §§ 3662, 3697. But it does not follow that every general deposit is a loan, or that this transaction was unlawful. A voluntary deposit for exchange is made by one giving to another, with his consent, the possession of personal property to keep for the benefit of the former, or of a third party—the depository being only bound to return a thing corresponding in kind to that which is deposited—and creates between the depositor and depositary the relation of debtor and creditor. Comp. Laws, §§ 3658, 3662, 3697. A loan of money is a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed. Comp. Laws, § 3715. It, of course, creates the relation of debtor and creditor. When the personal property involved is money, it may be difficult, under some circumstances, to determine whether the transaction should be called a deposit or a loan; but the two are not the same, and are never so regarded by any one in business, or the ordinary affairs of life. Certainly the thousands who daily deliver money to banks for safe-keeping, and return in corresponding currency, do not regard the transaction as a loan, nor do they so speak of it. A careful examination of the definitions given in the Civil Code will show the

distinction between these terms. A deposit is for the benefit of the depositor; a loan, for the benefit of the borrower. It is true a deposit may also benefit the depositary, but such is not the primary object of the transaction. When the deposit is made for a fixed period, during which the depositor has no right to demand a return of the money, the transaction may be regarded as in all substantial respects a loan, but herein lies an essential distinction between a loan and a general deposit. In the former the person receiving the money agrees to return it at a future time; in the latter, at any time it is demanded. If it is agreed that the money shall remain for a fixed period, there is a loan, and not a deposit. This distinction is clearly stated by the Supreme Court of Pennsylvania in a case wherein, as in the one at bar, it was contended that a certain transaction should be regarded as a loan, and consequently unlawful. That court says: 'A deposit is where a sum of money is left with a banker for safe-keeping, subject to order, and payable, not in the specific money deposited, but in an equal sum. It may or, may not bear interest, according to the agreement. Whilst the relation between the depositor and his banker is that of debtor and creditor, the transaction cannot, in any proper sense, be regarded as a loan, unless the money is left, not for safe-keeping, but for a fixed period, at interest, in which case the transaction assumes all the characteristics of a loan.' Law's Estate, 144 Pa. St. 499, 22 Atl. 831 [14 L. R. A. 103]. To the same effect, in principle, are the recent cases of State v. McFetridge, 84 Wis. 473, 54 N. W. 1, 998 [20 L. R. A. 223], and State v. Hill [47 Neb. 456, 66 N. W. 541], supra."

In the case of State v. McFetridge, supra, a similar question arose in the state of Wisconsin, and was decided by the Supreme Court of that state. It became necessary to determine whether or not the deposit by the state treasurer of funds of the state in a bank constituted a loan or an investment of such money, and in determining that question, among others, the court used this language:

"Fourth. Was the making of such deposits a violation of section 258, Sanborn & Berryman, Ann. Stat., which expressly prohibits the investment of the trust funds in any manner not authorized thereby, or of section 160, which, by implication, prohibits the treasurer from making investments of any other funds in the treasury without the approval of the Governor? By those statutes such investments are restricted to the purchase of bonds of the United States, and of several states specified in section 258, and to loans to counties, towns, cities, villages, and school districts for terms not exceeding 20 years. Sections 258, 258b, 262a, subd. 2, Sanborn & Berryman, Ann. Stat. Investments of the trust funds must be made by the commissioners of the public lands. The treasurer alone has no authority to make any investment of the public funds. The deposits in question were made by Treasurer McFetridge from any and all the funds in the treasury, indiscriminately, although presumably his books showed what amount of each fund was thus deposited. Such deposits were made without the approval or concurrence of either of his associate commissioners of the public lands or the Governor. If those deposits were 'investments,' within the meaning of the above statutes, they were unlawfully made. Were they investments? The distinction between a general deposit of money in a bank payable at any time on demand and an investment of such money is plain and substantial. By such a deposit the depositor does not lose control of the money, but may reclaim it at any time. True, he loses control of the specific coin or currency deposited, but not of an equal amount of coin or currency having the same qualities and value, which, as we have seen, is all that is required of him. But if the funds in the treasury are invested in United States or state bonds, or in loans on time to counties, cities, etc., the treasurer loses control thereof, and the same cannot be replaced in the treasury until such bonds are paid or sold, or such loans become due, and are collected by due course of law. The retention by the treasurer of substantial control over the funds in the one case, and his loss of such control in the other, mark the leading distinction between a mere deposit of the funds and an 'investment' thereof, as those terms are used in statutes. This principle was applied by the Supreme Court of Pennsylvania in the case of Law's Estate, 144 Pa. 499 [22 Atl. 831, 14 L. R. A. 103]. * * * A valuable note to that case, in which many cases are cited bearing upon and supporting these views, will be found in volume 14 of Lawyers' Reports Annotated, p. 103. We are of the opinion, therefore, that, in making the deposits in question with banks, Treasurer McFetridge did not invest the state funds, and hence that he did not thereby violate the statutes which prohibited him from so doing."

In the case of Warren v. Nix, supra, a similar question was up for decision before the Supreme Court of Arkansas. In this case it was a county treasurer who deposited the funds of the county in a bank subject to check by said treasurer. In deciding the merits of the case it became necessary for the court to pass upon the question as to whether such deposit by said treasurer in the bank constituted a loan to said bank. The court discussed a number of the cases, and distinguished clearly the difference between a loan or an investment and a deposit subject to check. From the opinion we quote the following:

"In this connection it is argued that, when a general deposit is made in a bank, the relation between the depositor and the bank is that of creditor and debtor; and it is urged that a general deposit is simply a loan to the bank, and not a deposit for safe-keeping. But we think there is a clear distinction between a loan and a general deposit. When a loan is made, the money is borrowed for a fixed time, and the borrower promises to repay such amount at a fixed future date. But a general deposit is payable upon demand; in effect, the money thus deposited is kept under the control of the depositor, because it must be kept at all times subject to be paid upon his check. The money so deposited or its actual equivalent is returned to the depositor upon demand. Banks are

recognized in the commercial world as depositories where money is safely kept which upon demand will be returned in kind. It is universally understood that one of the chief purposes of the depositor in placing his funds in a bank is to put them where they will be safely kept. Ordinarily the depositor understands that he is leaving his money for safe-keeping, to be returned upon his order upon demand, and not that the identical pieces of money left with the bank will be returned, but only its equivalent.· He does not ordinarily understand that he is making a loan to the bank when he makes a deposit therein."

The authorities cited on both sides, actually deciding the question now being discussed, are from other jurisdictions, and we feel free to follow the line of decisions which affords the better reason for the conclusion reached.

As to the state of the Nebraska decisions, it will be found that the Bartley Case, supra, upon which appellant so strongly relies, was largely based upon State v. Keim, 8 Neb. 63, which was strongly criticized in the later case of State v. Hill, 47 Neb. 456, 66 N. W. 541, which decision was followed in the case of Farmers' & Merchants' Banking Co. v. City, 62 Neb. 442, 87 N. W. 175. It is true that the Bartley Case was not overruled or mentioned in this later decision, but the case upon which it was largely based was questioned, and it must be admitted that the Nebraska decisions are not in harmony upon the question.

While not without support in the authorities we are of the opinion that appellant's contention that the deposits authorized by this act constitute either a loan or an investment is unfounded.

We are also of the opinion that there is no diversion of the state's funds by the depositing thereof in banks under this act, in the sense that they are withdrawn from the treasury, in violation of the Constitution. By the terms of the act it is plain that the state's funds, while placed in a depository, are still under the custody and control of the Legislature, and are directly subject to the orders and drafts of the treasurer in the payment of the state's obligation. In other words, they are not out of the official custody and control of the treasurer, and cannot in any proper sense be said to have been drawn from the treasury. People v. McKinney, 10 Mich. 54; State v. McFetridge, 84 Wis. 473, 54 N. W. 1, 998, 20 L. R. A. 236.

It is true that a bank is not required to return the identical money deposited, but it must return, upon the draft of the treasurer, its equivalent and in kind. The money is not left on deposit for any fixed time, but may be withdrawn at any time, with the exception that where the treasurer desires to draw more than one-fifth of the funds in a depository he must give 10 days' notice of his intention. This, however, is but a reasonable regulation, and cannot ·suffice to change the character of the transaction to a loan, nor to give it the effect of depriving the treasurer of his official control over the fund. Upon this point, it was said in Estate of Law, 144 Pa. 499, 22 Atl. 831, 14 L. R. A. 103:

"It is true that two weeks' notice was to be given of the withdrawal of the deposit, but this was a reasonable provision, and not inconsistent with a bank deposit. Almost all savings institutions stipulate for notice of withdrawal with their depositors, and such a stipulation is for the benefit, not only of the bank, but also of its depositors. The reasonableness of the time is a question in each case to be determined by the court. It is said the trustee thereby loses control of the money; but that is not the true test. The depositor always, in a certain sense, loses control of the money when he places it in a bank; for the bank may refuse payment of his checks, and, as he then has no claim upon the specific money, he stands upon the footing of a creditor merely."

In determining whether, within the purview of our Constitution, money is drawn from the state treasury by the mere placing of the public funds in a state depository, it must be remembered that our Constitution does not require the state funds to be kept in the vaults of the treasury at Austin. We find no provision which expressly or by necessary implication requires this, and we believe none exists.

While it is true that one of the chief purposes of the State Depository Law is profit to the state by way of interest on the funds deposited, this is by no means the only consideration. The important element of safe-keeping cannot be ignored. Under the act the privilege is extended only to state and national banks, which are strongly safeguarded by state and federal laws. In addition to this, the act itself bears intrinsic evidence that the safety of the funds deposited was a matter of concern to the Legislature. Ample security is required to be deposited with the state treasurer by the depository, and the board is given the uncontrolled discretion to refuse a surety bond. The books and accounts of the bank are required to be kept open at all times to the inspection of the board, or any member. The board is given authority to make rules and regulations for the handling of the funds, as public interest may require. The law provides, not only for the deposit, but for the depositing and keeping of the funds in the depositories; and in article 2435, relating to clearing banks or depositories, the element of safe-keeping is expressly mentioned. Such clearing banks are authorized "for the clearing and safe-keeping of state funds, in the manner herein prescribed for the selection of state depositories." With these considerations in mind, it is plain that the Legislature had in view the safety of the funds deposited, as well as profit to the state.

[7] Upon this branch of the case, it remains only to consider whether there is any distinction, as to the constitutional questions raised, between funds of the general revenue and the special funds created or recognized by the Constitution. The loan and investment of the special funds and the purposes for which they are to be used are defined by the Constitution, and it is specially provided that they shall not be otherwise loaned or invested, and shall not be diverted from their constitutional purposes. Any legislative direction to the contrary would be clearly unconstitutional. However, we do not think that in any proper sense this act authorizes a loan, investment, or diversion of the special funds, with the exception, perhaps, of interest on special funds, which will be hereafter discussed. The officers, clothed with authority to lend and invest the special funds, and to discharge the same for their constitutional purposes, will be presumed to obey the Constitution, and to perform their duties in this respect. The deposit of these funds is not for any fixed time, and whenever such funds are deposited, awaiting investment or loan, they are subject to be withdrawn by the treasurer. It will be presumed that he will not fail to discharge this duty when investments or loans are obtainable.

It is a familiar rule that when authority is given a public officer in the public interest, it becomes his duty to exercise the power when the public interest arises. If the treasurer performs this duty, there is nothing in the terms or necessary operation of the Depository Act which will interfere with the constitutional method of lending and investing the special funds.

The alleged diversion in this case is in the mere depositing of such special funds in banks, and does not consist in the withholding of such funds from investment and loan, or other constitutional purposes. The mere temporary deposit of such funds, while awaiting investment or disbursement, does not interfere with their constitutional application, and it will not be presumed that the law will be so administered when its provisions do not so require. It is true that the appellant broadly alleges that these funds will be illegally diverted, but this is the conclusion of the pleader, and he does not state facts which show that this will be done, beyond the claim that the mere deposit of the funds in bank will so result.

We conclude that none of the constitutional provisions invoked are infringed by this law as to the principal of the funds deposited, and it remains only to consider the question of the interest arising upon the special funds.

[8, 9] The act provides that the interest upon all funds shall become part of the general revenue. Interest, according to all the authorities, is an accretion to the principal fund earning it, and, unless lawfully separated therefrom, becomes a part thereof. We think it is clear that the interest earned by deposit of special funds is an increment that accrues to such special fund, and any attempt of the Legislature to make such interest a part of the general revenue is futile, in the face of the constitutional provisions creating or dedicating these funds to special purposes. The broad language of the act would seem to make the interest upon all funds, whether general or special, become part of the general revenue, and this portion of the law, if so construed, would authorize a diversion of the special funds from their constitutional purpose, would specially violate section 7, article 8, and would be unconstitutional and void. However, we are not compelled to adopt such a construction.

It is a rule of interpretation that if a statute may be so construed as to avoid conflict with the Constitution it should be done. In section 83 of his work on Statutory Construction, Mr. Sutherland says:

"Another universal principle applied in considering constitutional questions is that an act will be so construed, if possible, as to avoid conflict with the Constitution, although such a construction may not be the most obvious or natural one. The courts may resort to an implication to sustain a statute, but not to destroy it."

In Pickle v. Finley, 91 Tex. 485, 44 S. W. 480, our Supreme Court recognized the rule that a legislative act will be given such construction, if possible, as will bring the operation thereof within the constitutional powers of the Legislature to enact the same. Other cases illustrative of the principle are: Sutherland on Statutory Con., §§ 83, 289; Adams Fish Market v. Sterett, 106 Tex. 562, 172 S. W. 1109; Madden v. Hardy, 92 Tex. 613, 50 S. W. 926; Johnson v. Hanscom, 90 Tex. 321, 37 S. W. 601, 38 S. W. 761; Callaghan v. McGown, 90 S. W. 319; McCullough v. Virginia, 172 U. S. 102, 19 Sup. Ct. 134, 43 L. Ed. 382; Atkins v. State Highway Com., 201 S. W. 226.

Of peculiar application to the issues of this case is the language of Mr. Justice Brewer, speaking for the Supreme Court, in McCullough v. State of Virginia, 172 U. S. 102, 19 Sup. Ct. 134, 43 L. Ed. 382. In the course of the opinion he said:

"It is elementary law that every statute is to be read in the light of the Constitution. However broad and general its language, it cannot be interpreted as extending beyond those matters which it was within the constitutional power of the Legislature to reach. It is the same rule which obtains in the interpretation of any private contract between individuals. That, whatever may be its words, is always to be construed in the light of the statute; of the law then in force; of the circumstances and

conditions of the parties. *So, although general language was introduced into the statute of 1871, it is not to be read as reaching to matters in respect to which the Legislature had no constitutional power, but only as to those matters within its control. And if there were, as it seems there were, certain special taxes and dues which under the existing provisions of the state Constitution could not be affected by legislative action, the statute is to be read as though it in terms excluded them from its operation.*"

We emphasize the latter portion of this quotation, because it announces the principle by which we are able to limit the general language of the Legislature, providing that interest on all funds shall become a part of the general revenue, so as to make this provision apply only to such funds as the Legislature might constitutionally make the interest thereon accrue to the general revenue. Since it was within the constitutional power of the Legislature to make the interest accruing upon the general funds a part of the general revenue, and 'the interest accruing to the special funds a part of those funds, we will construe the statute as having that meaning, although by so construing it we restrain the general language employed by the Legislature.

[10] Another rule, well settled in this state, is that if a part of a statute be void, but the remainder not, the valid portion should be sustained where it is divisible, and where such construction is compatible with the legislative intent. In the leading case of Western Union Tel. Co. v. State of Texas, 62 Tex. at page 634, Judge Stayton, speaking for our Supreme Court, quoted with approval from Cooley's Constitutional Limitations, as follows:

"When, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand."

Under this rule, if we should adopt the construction that the Legislature intended, in violation of the Constitution, to provide that the interest which should go to the general

220 S.W.—18

revenue should embrace interest upon special funds, we would still not feel at liberty to destroy the entire statute. Since the special funds deposited are each presumably ascertainable, and the amount of interest accruing thereon. separable from the interest upon the funds of the general revenue, they are not so inseparably connected and dependent upon each other, despite the broad and general language covering both subjects, as that it cannot be presumed that the Legislature would have passed the one without the other. On the contrary, we think it may be safely presumed that the Legislature would have passed this statute without the provision which, on its face, would seem to make interest on special funds a part of the general revenue.

If we be mistaken, however, in the conclusion that the portion of the act relating to interest can be given a construction that will render the act constitutional, or that the remainder of the act may be upheld, and only that portion of it which makes the interest on special funds become a part of the general revenue must fall, the result must be the same in this case. As we have held that plaintiff has no right to maintain the suit, he would not be entitled to an injunction to restrain the enforcement of the whole or any part of the act.

Respondents have made the proposition that laws creating depositories for public funds are in line with sound public policy, and are generally upheld as to their constitutionality, citing the following authorities: 18 Corpus Juris, 581; Steed v. Henry, 120 Ark. 583, 180 S. W. 508; People v. Flynn, 265 Ill. 414, 106 N. E. 961; Stillwater Bank v. Shepard, 22 Minn. 196; Fidelity & Deposit Co. v. Wilkinson, 109 Miss. 879, 69 South. 865; Montgomery v. State, 97 Miss. 292, 52 South. 357; State v. Edwards, 93 Miss. 704, 46 South. 964; Bobo v. Levee Comm'rs, 92 Miss. 792, 46 South. 819; Territory v. Matson, 16 N. M. 135, 113 Pac. 816; Charlton v. Cousins, 103 Tex. 116, 124 S. W. 422; Horton v. Rockwall County, 149 S. W. 299; Board v. Munson, 157 Mich. 505, 122 N. W. 117; Magee v. Lincoln County, 109 Miss. 183, 68 South. 77.

It will be found that these authorities generally support the proposition, but are not controlling in the determination of this case. As the questions here are to be decided according to whether the constitutional provisions invoked are applicable or not, it will subserve no useful purpose to discuss these cases, but they are cited as bearing generally upon the constitutionality of such statutes.

The writer frankly apologizes for the length of this opinion, but it is a pioneer case in Texas upon the subject-matter of the litigation. This, together with the importance

of the questions involved, is the justification for what would seem to be a too elaborate discussion.

The trial court, we think, rendered the proper judgment, and it will be affirmed.

Affirmed.