## ROBERT MILLS AND OTHERS v. THE STATE.

The Act of the 7th of April, 1846, to prohibit individuals from issuing bills, checks, promissory notes, or other paper, to circulate as money, was evidently passed in obedience to the 32d section of the General Provisions of the State Constitution.

But the Act of March 20th, 1848, to suppress illegal banking, was enacted to carry into effect the 30th section of the General Provisions of the Constitution; and cannot be held to have repealed, by implication, the statute of 1846.

Both these acts were intended to stand together, and to carry into effect the policy of the state, upon the general subject of private and illegal banking, and the issuing of bills, checks, &c., to circulate as money; but each applies to a particular type of the mischief at which they were aimed. The law of 1846, applies to private persons, or ordinary commercial firms; that of 1848, to corporations, companies, or associations.

The words " company," and " association," may be applied to an ordinary commercial partnership; but they are, in mercantile or commercial language, most frequently, and most properly, applied to many persons acting together, through officers or agents, in the prosecution of important enterprises.

And this is the construction to be given to these words, as used in the Act of March 20th, 1848; consequently, a commercial firm of three parties, do not, by issuing drafts, to circulate as money, incur the penalty imposed by the said act, but that prescribed by the Act of April 7th, 1846.

APPEAL from Galveston. Tried below before the Hon. Peter W. Gray. The facts are sufficiently stated in the opinion of the court.

*Ballenger & Jack,* for the appellants.—The court below erred in refusing the fourth instruction to the jury prayed by these defendants; and, in holding that the Act of March 20th, 1848, applied to them. We insist that the act, under which this suit was brought, does not apply to individuals or ordinary commercial partnerships, but to corporations, and organized companies, or associations.

The 32d section of the General Provisions of the Constitution, declares that the legislature shall prohibit by law, individuals from issuing bills, checks, promissory notes, or other paper, to circulate as money. The first legislature fulfilled this requirement. By Act of April 7th, 1846, it was provided, that

"no person or persons, within this state, shall issue any bill, promissory note, check, or other paper, to circulate as money in the same," and a penalty of not less than ten, nor more than fifty dollars, was affixed to each offence. (Hart. Dig., Art. 85.) There can be no doubt, that this law applied literally and expressly to persons acting in the character and capacity of the defendants. They were ordinary mercantile partners. No assumption of any special authority ; no organization to vary their act from that of any other persons in the community, was alleged, or proved. If they committed the offence charged against them, this law clearly provided and regulated a penalty.

On the 20th of March, 1848, the act was passed under which the prosecution was conducted; and the question arises, whether it shall be held to repeal the Act of 1846, with respect to ordinary commercial partners ; and to impose upon them a penalty of not less than two thousand, nor more than five thousand dollars, for the offence, for which, under the then existing law, they were liable to a fine of not less than ten, nor more than fifty dollars.

We think it should not. First, because there are no express words of repeal, and a repeal by implication will not be favored. Secondly, because its terms do not aptly or fairly apply to a mere commercial firm of three partners.

It does not purport to repeal or amend in part, or in any manner refer to, the Act of 1846. Considering the recency of that act, this seems a circumstance to indicate that no alteration was intended. Courts have always leaned very strongly against permitting one law to repeal, by mere implication, any of the provisions of a former law. Individuals, even in the most ordinary affairs, are entitled to the presumption of consistency, unless clear evidence of change is adduced. But laws, supposed to embody the public will, to be framed with gravity and wisdom, are not to be set aside, without express provision therefor, unless subsequent legislation leaves room for no other reasonable construction. Thus, it is said, a repeal is not allowed, if it be possible to make the two laws consistent. If not, it should be held

to repeal as little as possible. (10 Mod. 118.) No repeal, if it be possible to reconcile the two together. (Sedgw. on Const. 127.) Unless the repugnancy between the two is irreconcilable. (5 Hill, 221; 4 Gill & J. 1.) Only in cases of very strong repugnancy, or irreconcilable inconsistency. (6 Watts & Serg. 209; 10 Barr, 442; 21 Penn. St. Rep. 37.) Unless manifestly inconsistent and repugnant; if the two may subsist together. (2 Barb. S. C. Rep. 316.) Unless clearly repugnant. (6 Cushing, 465.)

The reasons against repeals, or changes of laws, by implication, are peculiarly strong, under our constitution. It requires a law to have but one object, which shall be expressed in its title. It prohibits any revision, or amendment of laws even, by reference to their title; requiring them, as modified, to be set out at length. These safeguards against constructive, implied, or uncertain changes in the laws, would seem to impose upon the courts, the duty of so construing a subsequent statute, as not to conflict in any respect with a prior statute, which it does not purport to amend or repeal, unless the implication is of the most imperative force.

Now is there any repugnacy between these two laws? Does the Act of 1848 apply so directly and explicitly, to an offence committed by three persons, composing a firm of merchants, that it must necessarily be held to repeal a quo, the Act of 1846, which, without question, does apply to an act committed by such persons? We submit that it does not; but that on the contrary, standing by itself, it could not by fair construction, be so applied.

That it is an act of "exceeding severity," and to be strictly construed, is settled by this court. (State v. Williams, 8 Texas Rep. 266.) It is "An act to suppress illegal banking." The terms bank, or banking, commonly refer to a public or incorporated bank, or its operations. True, individuals may carry on banking; but both in legal and ordinary parlance, this is denominated "private banking," and the natural and obvious application of the terms in the title to the act, would be to public banking by a corporation, or quasi corporation.

20

This we think sustained by reference to the constitution, to enforce the thirtieth section of the general provisions of which, this act was evidently passed. It prohibits *corporations* from being created, *renewed*, or *extended*, with banking or discounting privileges; leaving the question open, whether such privileges were then possessed by any corporate body; otherwise, why any provision as to their being renewed or extended? As respects individuals, the prohibition required, was against their issuing notes to circulate as money. But this was absolute; there could be no question, that no individual in Texas possessed such right, and accordingly the Act of 1846, makes the prohibition absolute and unconditional.

But the Act of 1848 also reserves the question for legal decision, as to the existence of such privileges; its prohibition extends to bodies "not authorised by law;" and seems clearly to have in view such acts or pretended acts of banking as were within the scope of the thirtieth section of the General Provisions of the Constitution.

The offenders pointed out by the act, are corporations, companies and associations of individuals. If these terms stood alone, and without other restrictive or definitive words, they do not extend in legal or business usage, much less in a severe penal statute, to a commercial partnership of three persons. The defendants were not a corporation. Were they a company? The information charges that they were associated together, and constituted a company.

Bouvier, defines "company," "an association of a number of individuals, for the purpose of carrying on some legitimate business. This term is not synonymous with partnership, though every such unincorporated company is a partnership. Usage has reserved this term to associations, whose members are in greater number, their capital more considerable, and their enterprises greater, either on account of their risk or importance. When these companies are authorized by the government, they are known by the name of corporations."

"Association," seems not to be a technical word; but is almost

identical with company. The association forms the company. This is the use of the term in the authorities, and also by the attorney-general, in framing his petition.

The companies and associations, then, to which the act refers, are, in our judgment, those which have organizations; which act through officers, and are in a shape to constitute corporations, if "authorized by law." This, the ordinary meaning of the words, is indicated very clearly to be the use intended in the statute. The second section provides, that suit shall be brought against them for the penalties incurred by the act, in the county in which they may keep their *office;* that service of citation may be made upon their *officers,* and that execution may be levied on *their estate,* or that of their *officers.* These terms, importing an organization, apply equally to the company or association, as to the corporation. They are not used hypothetically, or in the alternative. There is nothing to suggest that any others are referred to, than those which have an office and officers. We submit, then, to the court, that even admitting that companies and associations may be of two kinds, those which have an organization and officers, and those which are mere partnerships, the failure to designate the latter, (a term so definite and common,) and the descriptive terms employed in the act, leave no doubt, that in a severe penal statute, the construction should be confined to the former.

If a statute use a word susceptible of two meanings, and in another part use it in a definite sense, the latter sense governs throughout, unless the two are apparently used with different meanings. (James v. Dubois, 1 Harr. N. J. Rep. 285; Bristol v. Barker, 14 Johns. Rep. 205.)

*Attorney-General,* for the appellee.

BELL, J.—This suit was instituted in the court below, by the State of Texas, acting through her attorney-general, against Robert Mills and John W. Jockusch, residents of the city and

county of Galveston, and David G. Mills, a resident of the county of Brazoria.

The petition, or information, represented that the said defend-ants were partners in business, associated under the name, firm, and style of R. & D. G. Mills. The petition, or information, then proceeded to state : "That after the passage of the act of the legislature of the State of Texas, entitled ' an Act to suppress illegal banking, approved March 20th, 1848,' and heretofore, to wit, on the twenty-fifth day of February, A. D. 1853, in the county of Galveston, aforesaid, the defendants then and there associated together, and constituting a company, under the name, firm, and style of R. & D. G. Mills, as aforesaid, and having and keeping an office in the city of Galveston aforesaid, did then and there, to wit, on the day and year last aforesaid, in the county of Galveston aforesaid, without authority of law, issue in this state, to circulate as money, a certain lithographed, or en-graved and written draft, the said draft before being issued, having written across the face thereof, by the said defendants, for the purpose of giving credit and currency thereto, and that the same might circulate as money, the firm, name, and style of said defendants, of R. & D. G. Mills, as aforesaid." The petition, or information, then set out the draft, and proceeded to make substantially the same allegations, in reference to the issuance, by the defendants, of forty-nine other drafts.

The cause was submitted to a jury, who, under the instruction of the court, returned a verdict in favor of the state, and as-sessed the fine against the defendants, at the sum of one hun-dred thousand dollars. There was a motion for a new trial, which was overruled by the court. One of the grounds of this motion for a new trial was, that the act of the legislature, under which the suit was brought, was inapplicable to the defendants, and unconstitutional.

This suit was instituted for a supposed violation of the statute of March 20th, 1848, on the subject of illegal banking. This is shown by the fact, that the suit was instituted by the attorney-

general, by the allegations and prayer of the petition, and indeed, by all the proceedings in the court below.

We are of opinion, that the Act of March 20th, 1848, entitled, "an act to suppress illegal banking," has no application to such a company, or partnership, as the defendants are shown, by the testimony, to have constituted. The allegation of the petition is, that they were partners in business, associated under the name, firm, and style of R. & D. G. Mills. The testimony is, that the firm of R. & D. G. Mills was a mercantile firm, composed of three partners, doing a general commission business, receiving money on deposit, and dealing in exchange.

The statute of 1848 provides, "that any corporation, company, or association of individuals, who shall use or exercise banking, or discounting privileges in this state, or who shall issue any bill, check, promissory note, or other paper in this state, to circulate as money, without authority of law, shall be deemed guilty of a misdemeanor, and shall be liable to a fine, of not less than two thousand dollars, nor more than five thousand dollars, which may be recovered by a suit in the District Court, in the name of the state."

To save those who may read this opinion, the trouble of referring to the statute, I shall quote also its second section. It is as follows: "It shall be the duty of the attorney-general of this state, to institute suit against every corporation, company, or association of individuals in this state, who shall be guilty of a misdemeanor, as defined in the first section of this act; which suit shall be instituted in the District Court of the county in which any such corporation, company, or association of individuals may keep their office; and service of a citation upon the officers of any such corporation, company, or association of individuals, shall be a sufficient service; and in any judgment that may be obtained, under the provisions of this act, execution may be issued on the estate of the corporation, company, or association of individuals, against whom such judgment may be rendered; and in default of such estate, execution may be levied

on the estate of the officers of said corporation, company, or association."

Let us now look at the provisions of the statute of the 7th of April, 1846, entitled, "An act to prohibit individuals from issuing bills, checks, promissory notes, or other paper, to. circulate as money." As this statute contains but two short sections, I shall quote them, to save the trouble of reference. Section 1, provides, "That from and after the passage of this act, no person, or persons within this state, shall issue any bill, promissory note, check, or other paper, to circulate as money in the same." Section 2, provides, "That every person, who may violate this act, shall be subject to indictment therefor, by a grand jury, as for a misdemeanor, at any time within twelve calendar months after so offending; and shall be subject to a fine of not less than ten dollars nor more than fifty dollars, for each and every bill, promissory note, check, or other paper by them issued, in violation of the first section of this act."

It is important to observe, that the statute of 1848 contains no repealing clause. And we are of opinion, that it cannot be held by implication, to repeal the statute of 1846.

The 32d section of the General Provisions of the Constitution of the state, is to the effect, that "the legislature shall prohibit by law, individuals from issuing bills, checks, promissory notes, or other paper, to circulate as money."

The Act of the 7th of April, 1846, was enacted by the first legislature, which assembled after the formation of the state constitution, and was evidently in obedience to the requirement of the 32d section of the General Provisions; for the language of the statute is almost identical with the language of the constitution.

The 30th section of the General Provisions of the Constitution of the state, provides, that "No corporate body shall hereafter be created, renewed, or extended, with banking or discounting privileges."

We think that the statute of 1848, to suppress illegal banking, was enacted for the purpose of carrying into effect this 30th

section of the General Provisions of the Constitution. And inasmuch as the exercise of banking and discounting privileges, by companies and associations of individuals, was a violation of the spirit of the constitution, just as much as the exercise of the like privileges by a corporation, the statute was made to apply, not only to corporate bodies, but also to companies, and associations of individuals.

But what are companies and associations of individuals, and to what description of companies and associations of individuals, does the statute apply? The word company, is one of various and very comprehensive signification, and, standing alone, conveys no very definite idea. It applies to persons acting together for the prosecution of small or of great enterprises. Mr. McCulloch, in his Commercial Dictionary, says, "When there are only a few individuals associated, it is most commonly called a co-partnery; the term company being usually applied to large associations, like the East India Company, the Bank of England, &c., who conduct their operations by means of agents, acting under the orders of a board of directors."

The word "association," is used as synonymous with the word "company." Speaking of joint stock companies, Mr. McCulloch says, "The business of a great association, must be conducted by factors or agents." Treating of "open or regulated companies," the same author says, "The affairs of such companies, or associations, are managed by directors appointed by the members." In another place, this author says, "The conduct of the Dutch East India Company in burning spices, that their price might not be lowered by larger importations, is an example of the mode in which such associations uniformly, and, indeed, almost necessarily act." In speaking of the English East India Company, McCulloch defines it, or describes it, as "a famous association, originally established for prosecuting the trade between England and India." Numerous other quotations might be made, to show that the word "company," and the word "association," are, in mercantile or commercial language, most frequently and most properly applied to many persons acting

together, through officers or agents, in the prosecution of important enterprises.

It is very true, that these words may be applied to an ordinary commercial partnership. But we think it quite clear, that in the use of them in the statute of 1848, the legislature had in view such companies, corporations or associations, as act through officers; and it is only where a greater number of persons are associated together, than usually constitute a commercial partnership, that they are expected to act, or do, in point of fact, act through officers.

The statute provides that suit may be brought in the county where the company, corporation or association keep their office. It provides, further, that service of citation upon the officers, shall be deemed sufficient service upon the corporation, company or association. It provides, also, that where the state recovers judgment in any suit, for a violation of the statute, execution may be levied on the estate of the corporation, company or association against whom judgment may be rendered, and in default of such estate, then execution may be levied on the estate of the officers of such corporation, company or association.

It is shown by the testimony of one of the witnesses, that bills, or checks, were paid out to him by McMuller, who was called the cashier of the firm. A cashier is defined, by Webster, to be "one who has charge of money; a cash-keeper." The clerk, who had charge of the money of the firm; who kept the cash of the firm, and paid it out, might, with perfect accuracy, have been called the cashier of the firm, if there had been nothing paid out at the counter, but coin. But McMuller could not, in any proper sense, be called an officer of a company or association. Surely, service of citation on McMuller, would not have been sufficient service on the partners; and if the judgment were affirmed against the defendants, it could not be pretended that execution could be levied upon the estate of a clerk, who was called cashier, and who paid out bills at the counter, in case no property of the partners could be found.

We think it important to notice particularly, the fact, that the statute of 1848 does not authorize indictments by the grand juries, against those who violate its provisions, although the offence is called, in the statute, a misdemeanor.   It requires suit to be instituted by the attorney-general of the state.

The statute of the 7th of April, 1846, enacts, that those who violate its provisions, shall be indicted by the grand jury of the proper county.

Now, the statute of 1848 repeals the statute of 1846 *in toto*, or not at all.   If it be held, that the statute of 1848 wholly repealed the law of 1846, then it would follow, that no law existed in force from 1848, until the adoption of the Penal Code, or, rather, until the Penal Code went into effect in 1857, by which *a single individual*, who issued bills, checks, promissory notes or other paper, to circulate as money, could be punished; unless, indeed, such single individual could be held to be a corporation, or company, or an association of individuals.   And not only so, but it would follow, that from the year 1848, until the Penal Code went into effect in 1857, the offence of issuing bills, checks, promissory notes or other paper, to circulate as money, was entirely taken away from the consideration of the grand juries of the country.   And it would follow, that during that long period of time, the legislature imposed upon the attorney-general the task of enforcing the policy of the state, in reference, not only to illegal banking, but also to the issuance, by any persons, of bills, checks, &c., to circulate as money; so that, if A. and B., country merchants, in the county of Brazoria, and C. and D., lawyers, in the county of Red River, and E. and F., stock raisers, in the county of Cameron, and G. and H., medical practitioners, in the county of Sabine, chose to issue bills, checks, promissory notes or other paper, to circulate as money, the grand juries of those counties could take no notice of the matter, but the attorney-general of the state would be required to institute suits in the District Courts of those counties, for the punishment of the respective offenders.

I am aware, that the *reductio ad absurdum*, as it is called by the logicians, is not a safe mode of argument, in all cases. But it seems to me, that it may be employed with some propriety, to test the soundness of a proposition, which assumes to state correctly the intention of the legislature, in legislating upon a subject of so much public interest, as that of private and illegal banking has long been in this state. And, I think, when it is shown, that to hold that the law of 1846 is repealed by the law of 1848, will be, at the same time, to show, that the legislature has failed to carry into effect the policy of the constitution, upon a subject which it was intended should be watched with the most jealous vigilance, then we may well decline so to hold, unless forced to do so by the most obvious considerations.

Such considerations are not presented to our minds. It seems to us to be clear, that the law of 1848 did not repeal the law of 1846. They were both intended to stand together, and to be alike operative. And while they were both intended to be instrumental in carrying into effect the policy of the state, upon the general subject of private and illegal banking, and the issuance of bills, checks, &c., to circulate as money, it was, at the same time, intended, that they should each be made to apply to a particular type of the mischief, at which they were aimed. The law of 1846 was intended to punish any person or persons, not acting together as a corporation, or company, or association, who might issue bills, checks, &c., to circulate as money. The execution of this law, against such persons, was entrusted to the grand juries and courts of the state, in the same manner as are the criminal laws of the state generally. The law of 1848 was intended to reach a higher mischief. It was intended to punish corporate bodies, or large companies or associations, who might assume to set at naught the policy of the state, on the subject of banking. The execution of this statute was entrusted, by express enactment, to the attorney-general, the legal adviser, and principal law-officer of the state. This statute of 1848 also described two offences. One of them was the exercise of banking and discounting privileges. The

Mills v. The State.

other was the same offence, described by the law of 1846, to wit, the issuance of any bill, check, promissory note, or other paper, in this state, to circulate as money.

The law of 1846 punished the offence of issuing any bill, check, &c., to circulate as money, by a fine of not less than ten dollars, nor more than fifty dollars, for each bill, or check, or note, or other paper issued. The statute of 1848 punished precisely the same act, by a fine of not less than $2000, nor more than $5000, for each bill, check, note, or other paper, issued. Now, why this wonderful disparity in the measure of punishment, prescribed by the two statutes? Surely, no good reason can be found in the history of the times, why the legislature should think the unlawful issuance of a bill, to circulate as money, was sufficiently punished by a fine of fifty dollars in 1846, and that the same act merited so heavy a punishment as a fine of not less than $2000, in 1848. But this difference in the measure of punishment prescribed by the two laws, is sufficiently explained, by supposing that the legislature intended the law of 1846 to apply to mere private persons, or ordinary commercial firms, and the law of 1848 to apply to powerful corporations, or companies, or associations, capable, from their organization, of extending the field of their operations, in such manner, as to inflict great and irreparable injuries upon the public. Such corporations, or companies, or associations, would, of course, be comparatively few in number. Their acts and doings, the centre of their operations, the officers who managed their affairs, would all be known to the public; and it was, therefore, demanding but a reasonable service from the attorney-general, to require him to call them to an account.

These views lead us to the conclusion, that the Act of 1848, upon which the information in this case was founded, had no application to the defendants; and that the court below erred in overruling the motion for a new trial, based, as it was, upon the ground of the inapplicability of the law to the case of the defendants.

The judgment of the court below is, therefore, reversed. And inasmuch as we are of opinion, that the defendants were only liable to be punished under the provisions of the law of 1846, this case will be dismissed.

There are some very interesting questions argued by the counsel in their briefs, which, of course, it is unnecessary for us to consider.

Reversed and dismissed.