

# THE ATTORNEY GENERAL
# OF TEXAS

October 31, 1988

JIM MATTOX
ATTORNEY GENERAL

Honorable O. H. "Ike" Harris      Opinion No. JM-975
Chairman
Economic Development Committee      Re:    Whether  public   funds
Texas State Senate                  may  be  invested  in  bank-
P. O. Box 12068                     oriented money market mutual
Austin, Texas    78711              funds  pursuant  to  article
                                    842a-2, V.T.C.S.   (RQ-1345)

Dear Senator Harris:

Your letter   requesting   an opinion   from   this   office reads in part:

> The 70th Legislature of Texas passed House Bill 1488 enacting  The Public Funds  Investment Act  of 1987,   now codified  in  Article 842a-2,  Vernon's  Annotated  Texas  Civil Statutes  (the  'Act'),  in  order  to  grant public bodies an  expansion of their  investment authority.  As a  sponsor in the  Senate of the  companion bill  to H.B.  1488 and  as Chairman of the Committee on Economic  Development which heard  and passed  such bill,  I have received  a  number  of  inquiries  from representatives of public  bodies and  financial institutions as to the proper  interpretation of  Section  2(b)  of  the  Act  which authorizes investment  of  bond  proceeds  in 'common trust funds <u>or comparable  investment devices  owned  or   administered  by  banks domiciled in  this  State</u>'  (emphasis  added) which  consist  solely  of  certain  eligible obligations described in  the Act  ('Eligible Obligations').  (Emphasis in original.)

> . . . .

> In [Attorney General Opinion] JM-570,  you held  that  traditional  money-market  mutual fund shares were not eligible for  investment of city  funds (even  though the  funds  were restricted  to  holding  federal  securities) because  no  Texas  statute  authorized  such

investment. The question now is whether H.B. 1488 succeeded in overcoming that statutory deficiency if the mutual fund is an integral part of a Texas bank's management and investment services. Accordingly, your opinion is respectfully requested as to whether a bank-oriented money market mutual fund of the type described below constitutes a 'comparable investment device owned or administered by a bank domiciled in this State,' within the meaning of the Act, such that a public body that otherwise complies with the requirements of the Act may lawfully invest its bond proceeds in such fund. (Emphasis added.)

"Common trust funds . . . administered by banks" refers to the classification of funds excluded from the definition of "investment company" by the Federal Investment Company Act of 1940, referring to "any common trust fund or similar fund maintained by a bank exclusively for the collective investment and reinvestment of moneys contributed thereto by the bank in its capacity as a trustee, executor, administrator, or guardian." 15 U.S.C. § 80a-3(c)(3); see Prop. Code § 113.171; Shannon v. Frost Nat'l Bank of San Antonio, 533 S.W.2d 389 (Tex. Civ. App. - San Antonio 1975, writ ref'd n.r.e.). It is explained:

Basically, the common trust funds maintained by banks are investment companies in purpose and mode of operation, and, without the exception in the 1940 Act, they would be regulated by the Act.

T. Frankel, 1 The Regulation of Money Managers, ch. V(G), § 10.2, at 422.

As your letter requesting an opinion advises, the common trust fund typically sells units of participation in the fund, each representing an equal, undivided interest in its portfolio of securities, and, in the event of a dissolution of a common trust fund, the owners of units of participation will receive, pro rata, subject to the rights of creditors, the proceeds of such sale less the liabilities of the fund. As described, participation in such funds is similar to the participation of shareholders in corporations organized for private gain. In Presnall v. Stockyards Nat'l Bank the court said:

It is generally agreed that shares in an incorporated company are the aliquot parts of

> the capital stock, and merely give to the owner a right to his share of the profits of the corporation while it is a going concern and to a share of the proceeds of its assets when sold for distribution in case of its dissolution and winding up. The shares do not give to their owners any right in the property itself of the company. That remains in the artificial body called the corporation. The right of the individual shareholder, according to the amount put into the fund of the corporation, is therefore of an incorporeal nature, though of value, not capable of manual delivery.

151 S.W. 873, 876 (Tex. Civ. App. - Texarkana 1912), aff'd, 194 S.W. 384 (Tex. 1917).

Your specific question asks whether a bank-oriented money market mutual fund "of the type described below" constitutes a "comparable investment device" within the meaning of the Public Funds Investment Act of 1987, and you draw several parallels between the particular fund you describe and a "common trust fund." If we assume the bank-oriented money market mutual fund to be "a comparable investment device," a question arises as to whether it is an "individual, association or corporation" to which political corporations and subdivisions are forbidden to lend credit or in which they cannot become stockholders.

Article III, section 52(a), of the Texas Constitution reads:

> Sec. 52 (a) Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company. However, this section does not prohibit the use of public funds or credit for the payment of premiums on nonassessable life, health, or accident insurance policies and annuity contracts issued by a mutual insurance company authorized to do business in this State.

None of the later-stated exceptions in section 52 embrace loans to, or investments in, private enterprises or their shares.

If "units of participation" in a mutual fund are the equivalent of shares of stock in a corporation, association or company within the contemplation of article III, section 52, of the Texas Constitution, such investments cannot be authorized by the legislature. See Lewis v. Independent School District of Austin, 161 S.W.2d 450, 452 (Tex. 1942). See also City of Tyler v. Texas Employers' Ins. Ass'n, 288 S.W. 409 (Tex. Comm'n App. 1926, judgment adopted), aff'd on rehearing, 294 S.W. 195 (1927).[1]

In Investment Company Institute v. Camp, 401 U.S. 617 (1971), the United States Supreme Court considered the plan of a national bank to go into the business of operating a mutual investment fund. As described by the court:

> Under the plan the bank customer tenders between $10,000 and $500,000 to the bank, together with an authorization making the bank the customer's managing agent. The customer's investment is added to the fund, and a written evidence of participation is issued which expresses in 'units of participation' the customer's proportionate interest in fund assets. Units of participation are freely redeemable, and transferable to anyone who has executed a managing agency agreement with the bank. The fund is registered as an

---

1. Monies paid to banks for such investment purposes are not the equivalent of "deposits." In Lawson v. Baker, 220 S.W. 260 (Tex. Civ. App. - Austin 1920, writ ref'd), the state depository statute was attacked on grounds that the placement of state funds on deposit with banks amounted to an unconstitutional loan or investment of public funds. The court concluded that deposits authorized by the statute in question were not loans or investments. It reached that conclusion by reasoning with other jurisdictions that

> the general depositing of money in a bank or depository, with or without interest, subject to the check or demand of the depositor, is not a loan or investment.

Id. at 269.

investment company under the Investment Company Act of 1940. The bank is the under-writer of the fund's units of participation within the meaning of that Act. The fund has filed a registration statement pursuant to the Securities Act of 1933. The fund is supervised by a five-member committee elected annually by the participants pursuant to the Investment Company Act of 1940. The Securities and Exchange Commission has exempted the fund from the Investment Company Act to the extent that a majority of this committee may be affiliated with the bank, and it is expected that a majority always will be offi-cers in the bank's trust and investment division. The actual custody and investment of fund assets is carried out by the bank as investment advisor pursuant to a management agreement. (Emphasis added.)

401 U.S. 617, at 622-623.

A federal law provided that a national bank "shall not underwrite any issue of securities or stock." 12 U.S.C. § 24. After observing that a bank which operates an invest-ment fund has a particular investment to sell, the court held that the operation of the investment fund involved a bank in the underwriting, issuing, selling and distributing of securities in violation of the federal law as it then read. Camp, 401 U.S. 617, at 639.

In the course of reaching its decision, the court noted:

A mutual fund is an open-end investment com-pany. The Investment Company Act of 1940 defines an investment company as an 'issuer' of 'any security' which 'is or holds itself out as being engaged primarily . . . in the business of investing . . . in securi-ties . . . .' 15 U.S.C. §§ 80a-2(a)(21), 80a-3(a)(1). An open-end company is one 'which is offering for sale or has out-standing any redeemable security of which it is the issuer.' 15 U.S.C. § 80a-5(a)(1). An investment company also includes a 'unit investment trust': an investment company which, among other things, 'is organized under a . . . contract of . . . agency . . . and . . . issues only redeemable securities, each of which represents an undivided

> interest in a unit of specified securities
> . . . .'  15  U.S.C.  § 80a-4(2).   (Emphasis
> added.)

Id at 625 n. 11.

The characterization of a "unit of participation" by the United States Supreme Court as a "proportionate interest in the fund assets" could be fairly used as a description, also, of a share of stock. See Presnall v. Stockyards Nat'l Bank, supra. Section 52 of article III of the Texas Constitution prevents a county, city or other municipal corporation from becoming "a stockholder" in a "corporation, association or company." It has been suggested, however, that units of participation in bank-oriented money market mutual funds are not the functional equivalents of shares of stock in a profit-seeking enterprise, and that holders of certificates evidencing ownership of such participatory interests would not be "stockholders" within the meaning of the constitution.

The argument suggests that units of participation in a portfolio consisting of governmental obligations are not equivalent to shares of stock within the constitutional prohibition because they are not shares of bank stock, they are not interests in a portfolio of securities consisting of stock in a private corporation, association or company, and the fund itself is not a corporation. However, it must be admitted that such funds, though not organized as corporations, are private enterprises operated for profit or gain, that money invested in such an enterprise is put at risk in a common venture, that the securities in the portfolio of the fund (whether consisting of stocks of private corporations or of government bonds) are merely the assets of the fund and not themselves the enterprise, and that return on the investment depends upon how those assets are used by fund managers.

In Attorney General Opinion JM-570 (1986), to which you refer, we advised that money market mutual funds, including those that deal only in government securities, are private enterprises operated for private gain. We also said:

> While it may be true as an abstract matter that an investor in such a fund owns an undivided pro rata interest in the portfolio of short-term obligations owned by the fund, it is true only in the same sense that an investor in the stock of a manufacturing concern can be said to own an undivided pro

> rata interest in the machinery, buildings, and other assets of the manufacturer. The investor can exercise no personal control over the portfolio of the fund or its disposition, and has no right to reduce to possession any part of it for safekeeping or for any other purpose.

Attorney General Opinion JM-570 (1986), at 5. It was also noted there that an investor in such a fund assumes risks as to the fidelity, accountability and expertise of the fund managers as well as the financial stability and responsibility of the entities whose obligations are represented in the portfolio of the fund. Cf. Attorney General Opinion JM-23 (1983) (repurchase agreements).

Although we concluded in Attorney General Opinion JM-570 (1986) that statutes advanced there by proponents to support investment of public funds in the securities (including participatory "units") of private entities did not provide that support, we did not suggest that statutes purporting to do so, if enacted, would face no constitutional hurdles. Cf. Attorney General Opinions JM-932 (1988); JM-832 (1987); JM-545 (1986); JM-23 (1983); MW-224 (1980) (constitutional issue not addressed). The enterprise represented by a mutual fund such as you describe is one of individuals or entities associated for the purpose of private gain. Although the fund is not incorporated, it is an "association" or "company" within the meaning of the Texas Constitution. Mills v. State, 23 Tex. 295 (1859).

In Mills v. State, supra, the Texas Supreme Court had occasion to examine a provision of the 1845 Texas Constitution that provided, "No corporate body shall hereafter be created, renewed, or extended, with banking or discounting privileges." (Emphasis added.) Tex. Const., art. VII, § 30 (1845). In 1848, the legislature enacted a law declaring "[t]hat any Corporation, Company, or Asssociation of individuals who shall use or exercise banking or discounting privileges in this State, . . . shall be deemed guilty." (Emphasis added.) An Act to Suppress Illegal Banking, Acts 1848, ch. 156, § 1, at 234. The court said:

> We think that the statute of 1848, to suppress illegal banking, was enacted for the purpose of carrying into effect this 30th section of the General Provisions of the Constitution. And inasmuch as the exercise of banking and discounting privileges, by companies and associations of individuals, was a violation of the spirit of the

> constitution, just as much as the exercise of the like privileges by a corporation, the statute was made to apply, not only to corporate bodies, but also to companies, and associations of individuals. (Emphasis added.)

Id. at 302-303. The court said the word, "company," as used, applied to persons acting together for the prosecution of enterprises, and that the word, "association," was used as a synonym for "company." Those words signified, the court concluded, persons acting together, through officers or agents, in the prosecution of important enterprises. Id. at 303-304.

Scarcely fifteen years later, using words given meaning by the Mills court, section 52 of article III of the 1876 Constitution was written to deprive the legislature of power to authorize any political subdivision to become a "stockholder" in a "corporation, association or company." In that era, "stock" broadly referred to the capital of an enterprise. The 1859 edition of Bouvier's Law Dictionary defined "stock" as:

> The capital of a merchant, tradesman, or other person, including his merchandise, money and credits. In a narrower sense it signifies only the goods and wares he has for sale and traffic. The capital of corporations is also called stock; this is usually divided into shares of a definite value, as one hundred dollars, fifty dollars per share.

2 Bouvier's Law Dictionary (8th ed. 1859), at 550.

In the light of Mills v. State, the reference placed in the new constitution to "stockholders" in associations and companies (as well as to stockholders in corporations), exhibited a plain determination that its prohibition should reach participation in non-corporate, private enterprises of aggregated capital. That is the construction given the provision by the Texas courts. Lewis v. Independent School District of Austin, supra; McCaleb v. Continental Casualty Co., 116 S.W.2d 679 (Tex. 1938); Southern Casualty Co. v. Morgan, 12 S.W.2d 200 (Tex. Comm'n App. 1929, judgment adopted); City of Tyler v. Texas Employers' Ins. Ass'n, supra.

The leading case, Lewis v. Independent School District of Austin, supra, was decided by the Supreme Court of Texas in 1942 before the current final sentence was added to

article III, section 52(a)  by amendment (November 4,  1986, allowing the  purchase  of  certain  mutual  policies  with public funds), but it did not break new ground.  It followed a well marked furrow.

In 1916, the Texas Supreme Court, in Middleton v. Texas Power & Light Co., 185 S.W.  556 (Tex. 1916), said that  the Texas Employers Insurance Association (legislatively created in conjunction with the enactment of the Workmens' Compensation Law) was  not a private  corporation but, instead,  was only an agency for proper administration of the law notwithstanding its designation by  the legislature as a  "corporation."  Id. at 562.  (It issued no stock or certificates  of ownership and, in  fact, was  not "owned" by  anyone in  the usual sense, but its "subscribers" aggregated their  capital to operate  it  as a  vehicle  for their  common  advantage, sharing in its  success to  the extent it  relieved them  of obligations.)  A  decade later,  the Commission  of  Appeals held in City of Tyler v. Texas Employers' Ins. Ass'n, supra, that the "stockholder" provision of article III, section 52, prohibited the legislature from permitting political  subdivisions to  become members  of the  association. The  court said the  organization was  "a  corporation engaged  in  the insurance business on the mutual plan, whose subscribers are stockholders in such  corporation." Id. at  412. For  that reason, the court said, the constitution forbade cities  and towns from "becoming stockholders therein."  Id.

On rehearing, the Commission of Appeals denied that  it had overruled the Middleton case.  The court said the  point in the Middleton  case was  that the association  was not  a corporation within the meaning of the general law  authorizing corporations,  but  that it  did  not follow  that  the association did not have elements of a private  corporation, concluding:

> We have merely indicated our opinion that the nature of such association, whether 'technically a  corporation or  not,' is  such  that municipal corporations  cannot become  subscribers thereto without violating constitutional limitations.  (Emphasis added.)

City of Tyler v. Texas Employers' Ins. Ass'n,  294 S.W. 195, 196.

Later, in Southern Casualty  Co. v. Morgan, supra,  the Commission of Appeals read the  City of Tyler court to  have held:

> [T]he Legislature is without power (section 52, art. 3, Constitution) to authorize a municipal corporation of the kind involved to become, <u>in effect</u>, a 'stockholder' in the Texas Employers' Insurance Association (substantially a 'mutual' company), and thus to 'lend its credit,' etc., or to make the 'appropriation of public money' (held to be a gratuity) necessary to affecting insurance. (Emphasis added.)

12 S.W.2d 200. Later still, the Texas Supreme Court explained the <u>City of Tyler</u> holding. The court said in <u>McCaleb v. Continental Casualty Co</u>:

> It was also held that by virtue of section 52 of article 3 of our Constitution, Vernon's Ann. St. Const. art. 3, § 52, municipal corporations could not take out a policy of insurance in a mutual insurance company which would require a city to become <u>a member of or stockholder in</u> such insurance company. (Emphasis added.)

116 S.W.2d 679, 680 (Tex. 1938).

Nevertheless, when the <u>Lewis</u> case came before the Court of Civil Appeals in 1941, the intermediate court was persuaded that the <u>City of Tyler</u> and <u>Southern Casualty Co.</u> holdings were merely "obiter" to be dismissed as not controlling. <u>Lewis v. Independent School District</u>, 147 S.W.2d 298, 303 (Tex. Civ. App. - Beaumont 1941), <u>rev'd</u>, 161 S.W.2d 450 (Tex. 1942). The appeals court concluded that the school district in the <u>Lewis</u> case made <u>no</u> loan of its credit to the mutual insurance company from which it purchased workmen's compensation coverage, that the school district did <u>not</u> become a stockholder in the insurance company or a subscriber to its capital stock by its purchase of the insurance policy, and it quoted from a North Carolina case to the effect that a "stockholder" is the owner of shares in a corporation having capital stock represented by shares, and that a mutual company is without "stock" or "stockholders". <u>Id.</u> at 302.

When the <u>Lewis</u> case reached the Texas Supreme Court, the court characterized the question as whether the legislature could constitutionally authorize the school district, a political corporation, to purchase a policy of mutual insurance. Citing the <u>City of Tyler</u> case, among others, it said:

> This Court has held that Section 52 of Article 3 of our Constitution prohibits cities from becoming members of a mutual insurance association whose subscribers are stockholders in such company.

Lewis, 161 S.W.2d 450, 452.

It held the school district to be prohibited by the Texas Constitution from taking a policy in the mutual company, saying:

> The language used in the Constitution is clear and unambiguous. It specifically prohibits the School District from becoming a stockholder in a corporation, association, or company. Whether the public policy announced in the Constitution is wise or unwise is not for this Court to decide. As said by Judge Speer, in the case of City of Tyler v. Texas Employers Ins. Ass'n., Tex.Com.App., 294 S.W. 195, 197:
>
> > 'It is not a question of expediency, for upon that point we might all agree, but expediency cannot substitute the judgment of the municipality for that of the judgment of the framers of the Constitution. Public policy cannot be contrary to the express provisions of the Constitution. When that instrument speaks, the matter is indelibly settled, and its wisdom cannot be questioned.'   (Emphasis added.)

Id. at 452-453.

We are persuaded that "units of participation" in a mutual fund operated as a private enterprise, whether "bank-oriented" or not, are the functional equivalents of shares of stock within the meaning of article III, section 52 of the Texas Constitution.  As a consequence, it is not within the power of the Texas Legislature to permit municipalities to invest public funds therein and to thereby become "stockholders" in an association or company within the meaning of that provision.

In 1986, subsection (a) of article III, section 52 was amended to add a final sentence to the general prohibition:

> However, this section does not prohibit the use of public funds or credit for the payment

of premiums on nonassessable life, health or accident insurance policies and annuity contracts issued by a mutual insurance company authorized to do business in this state.

Although the 1986 amendment added a sentence which now expressly allows the use of public funds to purchase certain mutual policies, the amendment did not otherwise alter the scope of the constitutional prohibition, and we believe it continues to prohibit the investment of public funds in other private enterprises of aggregated capital, whatever might be their nomenclature.

In recent years, the courts of other states have accorded a similar reading to prohibitory provisions found in their own constitutions. See In re Lion Capital Group, 49 Bankr. 163 (S.D.N.Y. 1985); Board of Trustees of the Public Employees' Retirement Fund of Indiana v. Pearson, 459 N.E.2d 715 (Ind. 1984); Public Housing Administration v. Housing Authority of Bogalusa, 137 So.2d 315 (La. 1961). Cf. Louisiana State Employees' Retirement System v. State, 423 So.2d 73 (La. Ct. App. - [1st Cir.] 1982), writ denied, 427 So.2d 1206 (1983).

In our opinion, insofar as the Public Funds Investment Act of 1987 (article 842a-2, V.T.C.S.) purports to authorize political corporations and political subdivisions to invest public funds in bank-oriented money market mutual funds or securities of private entities, it conflicts with the constitutional provision.

## S U M M A R Y

Insofar as article 842a-2, the Public Funds Investment Act of 1987, purports to authorize political corporations and political subdivisions to invest public funds in bank-oriented money market mutual funds or other securities of private entities, it conflicts with article III, section 52, of the Texas Constitution.

Very truly yours,

JIM MATTOX
Attorney General of Texas

p. 4972

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Bruce Youngblood
Assistant Attorney General